IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KATHY GROCHOWSKI
    *Plaintiff*,

    v.

SCIENCE APPLICATIONS
INTERNATIONAL
CORPORATION,
    *Defendant*.

Civil Action No. ELH-13-3771

**MEMORANDUM OPINION**

Kathy Grochowski has sued her former employer, Science Applications International Corporation ("SAIC"), alleging employment discrimination. *See* ECF 2 ("Complaint").[1] Grochowski, who commenced her employment with SAIC in 2006, was one of forty-eight employees terminated by SAIC in 2010. In Count I, Grochowski alleges that she was terminated as a result of sex discrimination, in violation of Title VII of the Civil Rights Act of 1964, codified as amended at 42 U.S.C. §§ 2000e *et seq*. Grochowski also claims in Count I that, during her employment with SAIC, she was subject to disparate pay on the basis of sex, in violation of Title VII.[2] SAIC counters that Grochowski was laid off as part of a corporate reorganization of SAIC. It also disputes the claim of disparate pay.

Now pending is defendant's motion for summary judgment ("Motion," ECF 26), supported by a memorandum of law (ECF 26-1, "SAIC Memo.") and twenty exhibits (ECF 26-1

---

[1] Plaintiff originally filed suit in the Circuit Court for Harford County. SAIC removed the case to federal court on the basis of federal question jurisdiction as well as diversity of citizenship. *See* ECF 1 (Notice of Removal); 28 U.S.C. §§ 1331, 1332.

[2] Count II seeks a "stay of threatened arbitration." ECF 2 at 7. However, SAIC has represented that it does not seek arbitration. ECF 26-1 at 1 n.1. Thus, Count II is moot.

through ECF 26-19; ECF 29 (sealed); ECF 33).   Plaintiff opposed the Motion (ECF 37,

"Opposition").   The Opposition is supported by thirty exhibits (ECF 37-2; ECF 37-3; ECF 37-5

through ECF 37-23; ECF 38-1 through ECF 38-9).   Defendant replied (ECF 50, "Reply"), and

submitted four additional exhibits (ECF 50-1 through ECF 50-4).[3]

The Motion has been fully briefed, and no hearing is necessary to resolve it.   *See* Local

Rule 105.6.   For the reasons that follow, I will GRANT defendant's Motion (ECF 26).

## I.   Factual Background[4]

SAIC is a "scientific, engineering, and technology applications company that helps its

government and commercial customers solve problems in the areas of national security, energy

and the environment, critical infrastructure, and health."   ECF 26-1 at 11, SAIC Memo.   In May

2006, Grochowski was hired by EAI Corporation ("EAI"), a subsidiary of SAIC,[5] as a Deputy

Program Manager, Installation Preparedness.   ECF 26-2 at 1, Letter dated May 26, 2006, from

Barbara Kolch, Manager, SAIC Human Resources Department, to Grochowski ("Offer Letter").

In her role as Deputy Program Manager,[6] plaintiff worked in the company's Abington, Maryland

---

[3] Both sides have submitted excerpts of deposition testimony, with some duplication.
There are also duplicates of other exhibits. Where there are duplicate submissions, I have
generally cited to only one of the exhibits.  In addition, when citing to the depositions, I refer to
the ECF page number as well as the deposition page number and lines.

[4] For the convenience of the reader, I have appended to the Memorandum Opinion a
glossary of some of the acronyms and abbreviations that appear in the Memorandum Opinion.

[5] SAIC acquired EAI as a subsidiary in 2005.  ECF 26-14, Declaration of Joseph Niehaus
¶ 3.  Eventually, EAI was "fully integrated" into SAIC, although the timing of this integration is
not clear from the record. *Id.*

[6] The parties appear to use the terms Deputy Program Manager and Program Manager
interchangeably.  *Compare* ECF 26-2 at 1, Offer Letter (offering Grochowski a position as SAIC
"Deputy Program Manager") *with* ECF 37 at 5, Opposition (stating that for years Grochowski
worked as a SAIC "Program Manager"), *and* ECF 37-2 at 1, Declaration of Kathy Grochowski
¶ 3 ("Until my termination in 2010, I worked as a Program Manager").  But, Program Manager

office.  She began her job with a weekly salary of $1,634.61 ($85,000 per year).  *Id.*  By the time

of her termination, she earned more than $113,000 per year.  ECF 26-10 at 1.

Joseph Niehaus was SAIC's Deputy Operations Manager and Program Management

Officer.  ECF 26-14, Declaration of Joseph Niehaus ("Niehaus Dec.") ¶ 4.  In this role, he

supervised plaintiff.  *Id.*

A new EA1 organization structure was initiated in late August of 2008.  *See* ECF 26-3,

Memorandum dated August 25, 2008, regarding EAI Operation Organization Changes.  At that

time, SAIC established "Program Management Offices" ("PMO"), and the head of each PMO

reported to Niehaus.  *Id.*  Grochowski was assigned to the "Consequence Management PMO," as

Division Manager ("DM") of "Equipment Procurement."  *Id.*  Two other DM positions within

"Consequence Management" were also created.  One was for Contractor Logistics and the other

was for Security.  *Id.*

According to Niehaus, he is the one who recommended plaintiff's promotion to DM in

---

and Deputy Program Manager appear to be discrete positions.  *See* ECF 37-9 at 8, Grochowski
Performance Evaluation for the period March 10, 2007 to March 26, 2008 signed by Niehaus
("Kathy made the transition from DPM [*i.e.* Deputy Program Manager] to PM [*i.e.* Program
Manager] seamlessly . . . .").

The parties sometimes use the terms "Project Manager" and "Program Manager"
interchangeably.  *Compare* ECF 37-23 at 9, Defendant's Responses to Plaintiff's Requests for
Admissions (stating, "[p]laintiff had performed for SAIC in the position of the program or
project manager . . .") *and* ECF 38-1 at 12, Niehaus Deposition 141:9-10 (agreeing that
Grochowski was a "good project manager") *with* ECF 26-2 at 1, Offer Letter (offering
Grochowski a position of "Deputy Program Manager").

It appears that "Program Manager" and "Project Manager" are different job titles
reflecting distinct positions at SAIC.  *See*, *e.g.*, ECF 37 at 4, Opposition ("In filling Ms.
Grochowski's position, moreover, Mr. Fontenot was promoted from his Project Manager
position to Program Manager, [a] higher position . . . .").  Moreover, based on plaintiff's resume,
during her tenure as an SAIC employee, Grochowski never served in a position with the title
"Project Manager."  ECF 37-3.  She only officially served as a "Program Manager," a "Deputy
Program Manager," and a "Division Manager."  *Id.*

August 2008.  ECF 26-14, Niehaus Decl. ¶ 5.  But, due to the organizational charge, Niehaus no longer served as plaintiff's supervisor.  *Id.* ¶ 4.  In 2009, Niehaus became Operations Manager of SAIC.  *Id.*; *see also* ECF 37-22, Charge of Discrimination ("Charge").

As a result of the reorganization in 2008, plaintiff served "concurrently" as "Assistant Vice President, Division Manager" and "Program Manager."  ECF 37-2 at 1, Declaration of Kathy Grochowski ¶ 3 ("Grochowski Dec."); *see also* ECF 37-3, Grochowski Resume. Grochowski held both positions until her termination in 2010.  ECF 37-2 at 1, Grochowski Dec. ¶ 3.  In her capacity as Division Manager/Program Manager, Grochowski managed the provision of EAI/SAIC support services for the Explosive Ordinance Disposal ("EOD") program of the U.S. Marine Corps ("Marine Corps" or "USMC"), "valued at $3 million . . . ."  ECF 26-10 at 1, undated BFO - Case Analysis/Recommendation(s) (*i.e.*, Baltimore Field Office), prepared by the Equal Employment Opportunity Commission ("EEOC") ("EEOC Recommendation").[7]  She was responsible for three employees.  *Id.*

At a meeting on May 28, 2010, Niehaus and SAIC human resources representative Sharon Storm informed plaintiff of her termination, effective July 16, 2010.  ECF 37-2 at 1-2, Grochowski Dec. ¶ 5; *see also* ECF 38-1 at 32, Deposition of Niehaus ("Niehaus Depo.") 247:4-9.  Storm and Niehaus explained to Grochowski that "there wasn't a job, no longer a role for her" at SAIC, "as a result of the reorganization[.]"  ECF 38-1 at 31, Niehaus Depo. 246:5-6; 10-13.

---

[7]  Defendant explains that the EEOC Recommendation "represents the EEOC investigator's internal analysis and recommendations regarding Plaintiff's EEOC Charge of Discrimination. This document was obtained through a Freedom of Information Act request. Portions of the document were redacted by the EEOC."  ECF 26-1 at 12 n.3, SAIC Memo.

Therefore, "she was going to be laid off . . . ."  *Id.* at 246:7-8.[8]

Grochowski was one of 48 SAIC employees terminated in 2010.  Storm explained at her deposition:  "We had a, I guess, corporate reorganization or realignment of the business units. The business unit that we were working for was being, for lack of a better word, absorbed into other multiple other business units . . . ."  ECF 26-17 at 3, Deposition of Sharon Storm 25:18-26:1 ("Storm Depo.").[9]  Pursuant to the restructuring, the USMC programs were going to be consolidated at SAIC's location in Stafford, Virginia, closer to Marine Corps headquarters in Quantico, Virginia.

At the meeting, Grochowski received a written layoff notice.  ECF 25-2, Inter-Office Memorandum from Niehaus to Grochowski, dated May 28, 2010, regarding Notice of Layoff, ("Notice").   The Notice stated that an "alignment" of work within SAIC required "redeployment" of certain employees.  *Id.*  Further, the Notice explained that SAIC was not "completely successful in [its] efforts to redeploy all affected employees," and that Grochowski would be "subject to layoff" unless she found another "suitable position" within SAIC by June

_____

[8] Plaintiff claims she was terminated, not laid off.  *See e.g.*, ECF 37-2 at 1-2, Grochowski Dec. ¶ 5.  Throughout its papers, defendant characterizes the action as a "layoff," rather than a "termination."  Monica Jakubowski, an SAIC Assistant Vice President, claims that the terms are distinguishable.  She said: "Layoff means . . . it's not related to performance.  It's related to the amount of work that's available."  ECF 37-5 at 10, Deposition of Monica Jakubowski 63:1-10. In contrast, termination is "for cause" and in general it is due to a "performance" issue.  *Id.*

Because I construe the facts in the light most favorable to plaintiff, I generally refer to the employment action as a termination.

[9] At her deposition, Storm said 54 people were "laid off . . . ."  ECF 26-17 at 3, Storm Depo. 26:2.  However, in its Motion, defendant clarified that Storm "misspoke."  ECF 26-1 at 17 n.6, SAIC Memo.  SAIC explains: "A review of the documentation indicates that forty-eight individuals were laid off.  Whether the number is fifty-four or forty-eight does not make a material difference."  *Id.*  I agree that the discrepancy is not material.

11, 2010.  *Id.*  And, the Notice provided that Grochowski would be placed on leave without pay from June 11, 2010 until July 16, 2010, if she could not obtain another job within SAIC.  *Id.*

Grochowski claims that during the meeting on May 28, 2010, in an effort to salvage her job, she proposed commuting from her home in Bel Air, Maryland to Stafford, Virginia. ECF 37-2 at 2, Grochowski Dec. ¶ 6.   But, her request was rejected.  *Id.*  ¶ 7.  She was told the termination decision "had already been made."  *Id*.

As discussed, *infra*, upon Grochowski's departure from SAIC, Major Ronald Dahart assumed her responsibilities as the Division Manager/Program Manager of the EOD program. *See* ECF 37-23 at 8, Defendant's Responses to Plaintiff's Requests for Admissions ("SAIC Responses"); ECF 37-5 at 6, Deposition of Monica Jakubowski ("Jakubowski Depo.") 50:11. Niehaus did not disclose to plaintiff that "Mr. Dahart would be taking over her position" because, in Niehaus's view, "[i]t wasn't relevant."  ECF 38-1 at 32, Niehaus Depo. at 247:9-14; *see also id.* at 247: 17-21.

At his deposition, Niehaus admitted he was the one who decided to terminate Grochowski.  ECF 26-9 at 8, Niehaus Depo. 237:16 to 238:2; *see also id.*, 238:4-5 (stating, "I'm sure someone made a decision to approve it.").   The following deposition testimony is pertinent, ECF 26-9 at 8, Niehaus Depo. 238:15-240:19:

> Q. In the case of Ms. Grochowski in your deciding to lay her off what matters did you consider?

> A. The type of work. The primary [factor] was looking at the work itself, understanding that the work was being -- the EOD[10] work that she was managing was being integrated in with the [Marine Air Ground Task Force, *i.e.*] MAGTF and that our customer, the Marine Corps customer, had provided us through a [request for proposal] saying they wanted efficiencies in the

---

[10] As noted, the acronym stands for the program known as Explosive Ordinance Disposal.

management, SAIC management. Because these two programs were intended to be migrated, they wanted a-- they didn't want to pay two management teams from SAIC. They wanted an integrated one or they wanted to pay one. So that was primary. Certainly the -- considering that MAGTF was the larger program, more complex program, one that the EOD was going to be a subset within that in the future. And I considered customer relationships and institutional knowledge and expertise.

Q. Did you take into consideration how much work there would be even with a streamlined reorganization of that, management to that business?

A. Yes.

Q. And how did you take that into account?

A. Well, understanding that there would be efficiencies that would be gained or derived by managing these programs together, you know, so, yes, I looked at it that way.

Q. Did you take a look at when contracts that were going to be part of this reorganized program, what contracts, those existing contracts, when they would expire?

A. Sure, yes.

Q. And in the case of Ms. Grochowski what about the need for efficiency led you to decide that she could be dispensed with?

A. Because when we merged the EOD or merged the management and oversight of the MAGTF and the EOD task orders, the management required for EOD would go down because we would be deriving efficiencies from the rest of the team. And the fact that we were going to be managing it out of Stafford with an existing team, there just wasn't, there wasn't a demand to maintain Kathy as a Manager on the program for EOD.

As SAIC's customer, the Marine Corps had submitted to defendant a request for proposal

dated March 5, 2010, requesting the efficiencies described by Niehaus. ECF 26-9 at 8, Niehaus

Depo. 239:1-12; ECF 29 (sealed), "Statement of Work (SOW) for Contractor Logistic Support in

Support of the Explosive Ordinance Disposal Chemical, Biological, Radiological, Nuclear (EOD

(BRNE) Program"[11] ("Request for Proposal" or "RFP")[12]; ECF 25-5, emails dated March 4-5, 2010, regarding RFP.  The RFP related to the renewal of defendant's work on the EOD program, which Grochowski managed.  Although the RFP related to the EOD program in particular, it also cross-referenced other programs that EAI/SAIC managed for the Marine Corps, including the MAGTF, managed by Major Dahart.

Section 1.11 of the RFP is titled "Contract Manager."  The Request for Proposal specifically stated, at Section 1.11.3:  "All attempts for the CM [*i.e.*, Contract Manager, per § 1.11.1] to be the same Program Manager for the MAGTF CBRN ACM [*i.e.*, Marine Air Ground Task Force Chemical, Biological, Radiological, Nuclear Assessment and Consequence Management] program should be made." ECF 29 at 7 (sealed), RFP.[13]  The provision specifically included a reduction in costs as a purpose for using one program manager.  *Id.*  Moreover, it required "justification" for failure to do so.  *Id.*

The RFP also provided that the contractor "shall provide" all "services necessary to perform "Contract Logistics Support" ("CLS"),[14] *id.* at 2, RFP 1.2, and that "[t]he CLS is to be co-located, organized, and established in conjunction with the CLS  of the Marine Air Ground Task Force Chemical, Biological, Radiological, Nuclear Assessment and Consequence Management (MAGTF CBRN ACM) Program[.] "  *Id.* at 2, RFP 1.4.    It also stated, *id.*:

---

[11] "CBRNE" refers to the Chemical, Biological, Radioactive, and Nuclear Explosive program.

[12] Although the document is titled "Statement of Work," the parties refer to it as a RFP. *See*, *e.g.*, ECF 26-1 at 15, SAIC Memo.; ECF 37 at 5, Opposition.

[13] From time to time, MAGTF, MAGTF CBRN, and MAGTF CBRN ACM are used interchangeably.

[14] The abbreviation CLS is not used consistently in the RFP. As noted, RFP 1.2 defines the term as "Contract Logistics Support." ECF 29 at 2.  Elsewhere in the RFP, CLS is defined as Contractor Logistic Support. *See e.g.*, ECF 29 at 2- 18.

"Collaboration of the two programs are independent within each program.  At no time will either program depend on the other for success . . . .  This collaboration can be done by using one Contractor Program Manager for both the MAGTF CBRN ACM and EOD CBRNE programs." In addition, the RFP stated that "CLS members [who] are co-located . . . will work with the MAGTF ACM program CLS.  The intent is to reduce costs by using all CLS personnel for both programs."  *Id.* at 2-3, RFP 1.4.1.

David Shoffner, a former SAIC Senior Vice President, was "involved" in the hiring of Grochowski.  ECF 25-4 at 2, Deposition of David Shoffner ("Shoffner Depo.") 11:14.  At his deposition, Shoffner testified that men were laid off as a result of the reorganization.  *Id.* at 4, Shoffner Depo. 181:1-14 (stating that Bill Mengel, founder of EAI Corporation, and retired admiral James Olson were among the 48 SAIC employees laid off as a result of the reorganization).[15]  But, of those who were terminated, it is unclear how many were men and how many were women.

After Grochowski's termination, SAIC spent several months reorganizing.  *Compare* ECF 38-8 at 1 ("June 2010 Org. Chart") *with* ECF 38-8 at 2 ("Nov. 2010 Org. Chart").  The changes included the formation of the Preparedness and Response Division ("PRD").  ECF 38-1 at 42, Niehaus Depo. 312:6-10.  Following the reorganization, the EOD program became part of the PRD. ECF 38-8 at 1, June 2010 Org. Chart.  And, management of the EOD was assumed by Major Ronald Dahart (*see* ECF 38-1 at 32, Niehaus Depo. at 247:9-12), who was promoted to Division Manager while also serving as Department Manager.  ECF 25-3 at 4, Dahart Depo.

---

[15] When EAI was acquired by SAIC, Shoffner was an EAI "Senior Vice-President."  ECF 25-4 at 2, Shoffner Depo. 9:12.  After the acquisition, when EAI operated as a subsidiary of SAIC, Shoffner became Chief Operating Officer ("COO") of EAI.  *Id.* at 9:19 to 10:1.  And, as noted, Shoffner eventually became a "Vice-President" within SAIC.  *Id.* at 10:1-3.

13:12 to 16:17.  At her deposition, Jakubowski agreed that, prior to Grochowski's termination, Dahart and Grochowski  were "on the same management level[.]"  ECF 37-5 at 19, Jakubowski Depo. 161:10.

According to Niehaus, Dahart's responsibilities exceeded the "highest level achieved" by plaintiff.  ECF 26-9 at 5, Niehaus Dep. 131:21-132:3.  He gave "three reasons."  *Id.* at 132:5. Specifically, Niehaus mentioned the "[n]umber of contracts and the complexity of the contracts" that Dahart managed.  *Id.* at 132:6-7.  And, Dahart "was [SAIC's] senior leadership at the site [at] Quantico . . . providing day-to-day leadership communication responsibilities."  *Id.* at 6, 133:17-21.  In contrast, plaintiff "managed task orders that were focused on supply chain which was the delivery of equipment," and her work was "Domestic" in its "orientation," while Dahart's was international.  *Id.*at 5, 132:16-18, 134, 1-4.

Dahart oversaw six programs: the Marine Air Ground Task Force (*i.e.*, MAGTF); the Chemical, Biological, Radioactive, and Nuclear program ("CBRN"); the Marine Corps Law Enforcement Program ("MCLEP"); the Military Working Dog ("MWD") program, which was an Improvised Explosive Device ("IED") Detection Dog ("IDD") program; the Installation Protection Program ("IPP"); ECF 26-9 at 5-6, Niehaus Depo. 132:9-133:21; and the Chemical Biological Incident Response Force ("CBIRF").[16]  ECF 25-4 at 3, Shoffner Depo. at 86:11-

---

[16] In its Motion, defendant refers to "CBRIF," and indicates that this acronym stands for "Chemical Biological Response Force" program.  ECF 26-1 at 13, SAIC Memo.  Curiously, this definition does not account for the "I" in the acronym.  However, at his deposition, Shoffner referred to "CBIRF," the acronym for "Chemical Biological Incident Response Force."  ECF 25-4 at 3, Shoffner Depo. 86:14-15. It appears that the correct definition is the one employed by Shoffner, *i.e.*, Chemical Biological Incident Response Force.  MARINES, *Chemical Biological Incident Response Force*, http://www.cbirf.marines.mil/ (last accessed September 9, 2015).

87:15.[17]   He performed his role as Division Manager from the SAIC location in Virginia. ECF 26-9 at 6, Niehaus Depo. 133:17-19.   After the reorganization, Dahart was given the title of Department Manager (ECF 25-3 at 4, Dahart Depo. 15:1), and his duties included all of his prior responsibilities in addition to overseeing Grochowski's EOD program.   ECF 38-8 at 1, June 2010 Org. Chart.   The organizational chart for SAIC's PRD reflects this change as of June 2010.   *Id.*

Notably, in the June 2010 Org. Chart, Dahart is listed in two places as "USMC Programs Mgr., " overseeing six Marine Corps programs, and as "CBRN PM" for the "USMC EOD."   *Id.* Major Dahart's dual role, which included assumption of Grochowski's responsibilities as manager of EOD and as program manager of the entire Marine Corps division, lasted only five months.   By November 2010, Bristol Fontenot, another male SAIC employee, assumed management of the EOD.   The organizational chart for the PRD as of November reflects this change.   ECF 38-8 at 2, Nov. 2010 Org. Chart.

Of relevance here, "B. Fontenot" is listed on the chart as "CBRN PM" for the "USMC EOD."   *Id.*   In a request for admission, plaintiff asked defendant to admit:   "Plaintiff had performed for SAIC in the position of the program or project manager the types of services to the Marine Corps that Bristol Fontenot performed after November of 2010 and through at least

---

[17] To support the proposition that, prior to the reorganization, Dahart oversaw six Marine Corps programs, defendant sought to submit a "Performance & Development Review" for Dahart for the evaluation period 2008-2009.   The document appears to be designated Exhibit 12 to the Motion.   *See* ECF 26-1 at 6, SAIC Memo., Exhibits Index.   However, defendant failed to submit the document. Exhibit 12 in the courtesy copy submitted to the Court includes only a notice informing the court that Exhibit 12 is a sealed document.   Likewise, ECF 26-13, where Exhibit 12 is submitted electronically, shows only a notice informing the court that Exhibit 12 is a sealed document. The actual exhibit is not attached, however.   In ECF 25, where defendant has electronically submitted the previously sealed exhibits associated with its Motion, defendant has omitted any document designated as Exhibit 12.   Likewise, the courtesy copy of ECF 25 submitted to the Court does not include any document designated as Exhibit 12.

October 2012." ECF 37-23 at 9, SAIC Responses.  In response, defendant stated: "SAIC admits that a portion of Bristol Fontenot's duties were of the type performed by Plaintiff prior to her layoff.  SAIC cannot admit in full because Bristol Fontenot managed a broader and more complex set of services than those which pertained to Plaintiff."  *Id.*

Niehaus testified that when Fontenot assumed responsibility for overseeing the EOD it was a "less than full-time" position for him.  ECF 38-1 at 45, Niehaus Depo. 316: 11-12. According to Niehaus, in addition to overseeing EOD, Fontenot also served as one of the "program leads" for MAGTF under Don Snyder.  *Id.* at 316:3-5.  Although Fontenot does not appear elsewhere on the Nov. 2010 Org. Chart to reflect this additional responsibility, Niehaus explained at his deposition that the Nov. 2010 Org. Chart only indicates the heads of the various programs. Because Fontenot was only a *deputy* program "lead[ ]" for MAGTF, his name was omitted from the chart.  *Id.* at 319:1-2 ("[W]e are only listing the leads for those programs in the cart"); *see id.* at 318:18-19.  Indeed, "D. Snyder" is listed on the organizational chart as "CBRN PM" for MAGTF.  ECF 38-8 at 2, Nov. Org. 2010 Chart.

Three rungs above Fontenot on the Nov. 2010 Org. Chart, Dahart is listed twice.  *Id.*  He is listed once as "MPV"[18] and, further above Fontenot, he is listed as "USMC Programs Mgr." *Id.*  According to plaintiff, the Nov. 2010 Org. Chart demonstrates that Fontenot "fill[ed] the position that Plaintiff previously held, with Mr. Dahart now just shown in his oversight position."  ECF 37 at 13, Opposition.

In the meantime, on November 11, 2010, SAIC offered plaintiff another position as Tricare Program Manager for the Health Solution Business Unit.  ECF 26-7 at 1, Offer Letter

---

[18] The chart does not explain "MPV."  ECF 38-8 at 2.

dated November 11, 2010.  She accepted the offer and was thus reemployed by SAIC.  In her new position, plaintiff received an annual salary of $130,000.  ECF 26-8, Employee Profile for Grochowski dated November 22, 2010.  This exceeded the salary that plaintiff earned ($113,300) as of her termination.  ECF 26-10 at 1, EEOC Recommendation.  Grochowski claims she only remained in this new position "briefly."  ECF 2 at 4, Complaint (stating "SAIC briefly rehired Ms. Grochowski beginning November 22, 2010").  But, according to SAIC's "Response to Plaintiff's Amended First Set of Interrogatories," plaintiff retained her position as Tricare Program Manager until April 21, 2012.  ECF 37-11 at 9.  At that time, she was "terminated . . . due to [a] failure to perform to standards expected and required of the position . . . ."  *Id.*

Although SAIC maintains that the reorganization was in response to the client's request for more collaboration and consolidation with respect to certain Marine Corps programs, Grochowski disputes that she was terminated in order to achieve efficiencies that would allegedly result from consolidation under a unified management structure in Stafford, Virginia. She contends that her termination was the result of sex discrimination. In plaintiff's view, she was a high performing employee and, under the "camouflag[e]" of a reorganization, she was replaced by Dahart and then Fontenot due to SAIC's preference for male employees.  ECF 37 at 4, Opposition.

In her Declaration, plaintiff explains, ECF 37-2 at 2, Grochowski Dec. ¶ 10:

> The primary work locations for the EOD program that I was managing at the time I was terminated were Middletown, NY, for warehousing and Contractor Logistics Services, and Abingdon, MD, for purchasing, training development, training execution and logistics expertise.   In choosing to execute EOD out of Stafford, SAIC, therefore, was in fact moving management much further away from the location where most of the work took place.

In support of her contention, plaintiff submitted substantial evidence to show that she was

competent and received high marks throughout her time with SAIC.  For instance, she included a

performance evaluation for the period March 10, 2007 to March 26, 2008, signed by Niehaus, in

which Grochowski received an overall rating of "4 Frequently Exceeds Expectations."  ECF 37-9

at 9.[19]  On a scale of 1 to 5, 1 is designated as "Does Not Meet Expectations" and 5 is the best

mark, designated as "Far Exceeds Expectations: Exceptional Performance.  *Id.* at 2.[20]  A score of

4 is considered:  "Exemplary Performance."  *Id.*

The evaluation for March 10, 2007 to March 26, 2008 also included, *inter alia*, the

following comment, ECF 37-9 at 8:

> Kathy made the transition from [Deputy Program Manager] to [Program
> Manager] seamlessly while taking the business performance to a new record of
> revenue and profitability.  Her leadership and management skills in dealing with
> intense organizational change and incessant proposal demands were magnificent.
> She showed great diplomacy in dealing with flagging functional support . . . .
> Kathy proved she is a skillful [Program Manager] of a large and complex
> program . . . .

Similarly, Grochowski received a glowing performance review in her evaluation for the

period January 24, 2009 to January 22, 2010, submitted in February 2010, a few months before

Grochowski was terminated.   ECF 37-8 at 1.   Her evaluator, Monica Jakubowski, rated

Grochowski's "Financial Performance" as "4-Frequently Exceeds" and wrote, ECF 37-8 at 1:

"Kathy has exceeded her revenue goals through the additional support for her EOD customer

with $52.9M. Through excellent project management and procurement pricing, her fee goals

were also exceeded with fees 6% over goal. Her time sold was met with 88%. She is consistently

assiduous in ensuring that competent ETC and EACs are conducted in a timely manner with

---

[19] ECF 37-9 includes SAIC performance evaluations for Grochowski for three evaluation
periods: 2007, 2008, and 2009.

[20] Plaintiff does not explain why Niehaus would have been so complimentary if he had a
bias against women.

management of performance ongoing."[21]   *Id.*   Jakubowski also wrote: "Kathy has developed an excellent rapport with her MAGTF EOD customer."   *Id.* at 2.

Jakubowski agreed that both Grochowski and Major Dahart were "good program manager(s)" (ECF 37-5 at 18, Jakubowski Depo. 141:5-7, 12-14), capable of overseeing "complex" and "[c]hallenging" programs.   *Id.* at 11, Jakubowski Depo. 84:1-10.   The following deposition testimony of Jakubowski is pertinent, *id.*:

> Q.      In the time that you were supervising Mr. Dahart was it your view that he was able satisfactorily to manage any program that was complex?
>
> A.      Yes.
>
> Q.      Challenging?
>
> A.      Yes.
>
> Q.      The same would be true for Ms. Grochowski, correct?
>
> A.      Yes.

Plaintiff also submitted Jakubowski"s "Letter of Recommendation" dated May 30, 2010. ECF 37-6 ("Recommendation Letter").   In the Recommendation Letter, Jakubowski stated that Grochowski "has been complemented [sic] by her customer for responsive technical and management support."   *Id.* at 1.   Jakubowski also expressed "a great deal of respect for [Grochowski's] knowledge and intellectual ability . . . ."   *Id.*

To demonstrate her competence, plaintiff also highlighted her high utilization rate, and in particular her "direct" time (ECF 37-2 at 2, Grochowski Dec. ¶ 11), *i.e.*, time that is billable to a client pursuant to the client's contract.   ECF 37-5 at 17, Jakubowski Depo. 134:9-21.   It may be indicative of performance, especially if one is "a lower level" employee.   *Id.* at 134:15.   As

---

[21] The performance evaluation found at ECF 37-8 is difficult to read.

explained by Jakubowski, If you are a "lower level, less experienced" employee, you "need to have" direct work." *Id.* at 134:18.

Based on a review of Dahart's fifty-one pages of timesheets for the four-month time period preceding Grochowski's termination (ECF 38-6, "Dahart Timesheets"), plaintiff calculates that only 46% of Dahart's hours constituted direct time, *i.e.* work billable to SAIC clients, as opposed to "administrative" work or "overhead." ECF 37 at 12. In contrast, based on a review of twenty-two pages of timesheets for Grochowski for the four-month period preceding plaintiff's termination (ECF 38-7, "Grochowski Timesheets"), plaintiff calculates that at least 77% of her hours were billed to the client. ECF 37 at 12, Opposition. Grochowski insists that these time records demonstrate that "her billable time worked considerably exceeded Mr. Dahart's percentage." *Id.* Because direct time is a "critical metric for evaluating employee performance and utility," plaintiff suggests that by assigning Grochowski's responsibilities to Dahart for the five-month reorganization period, SAIC presented Dahart with an opportunity to increase his direct time and immunize his position from elimination during the reorganization. *Id.*[22]

Defendant does not challenge plaintiff's direct time calculations. Indeed, defendant admits Grochowski's direct time exceeded that of Dahart for the four-month period prior to her termination. ECF 37-23 at 2, SAIC Responses. Therefore, relative to Dahart, plaintiff had a higher utilization rate.

Moreover, Niehaus admitted at his deposition that Grochowski was a "good project manager." ECF 38-1 at 12, Niehaus Depo. 141:9-10. He maintained that Grochowski's

---

[22] The relevance of this assertion is not entirely clear, because by this point plaintiff was already terminated.

performance was not the reason for her termination. *Id.* at 33-34, Niehaus Depo. 248:18-249:1.

Nonetheless, Niehaus also suggested that Grochowski's management style may have contributed

to the decision to transfer her responsibilities to someone else during the reorganization.

Niehaus mentioned Grochowski's difficulty in "resolving differences" among her staff (ECF 38-

1 at 36, Neihaus Depo. 262:19), citing this personality trait as one that "reflected negatively on

her performance. *Id.*, Neihaus Depo. 262:13-15. Niehaus testified as follows, *id.* at 36-37,

Neihaus Depo. 262:11-262:8:

> Q. Is it your view that Ms. Grochowski's handling of some matters involving Mr. [James] Parham[, a SAIC employee[23]] reflected negatively on her performance in fiscal year 2010?
>
> A. Yes.
>
> Q. And why do you say that?
>
> A: Because the impression I got from people like Monica Jakubowski and others were that Kathy had a hard time resolving differences with her staff –
>
> Q. With her –
>
> A. – and created – I'm sorry – and created frustration with her staff and the customer at the Marine Corps.

Niehaus also stated: "Kathy can be a source of conflict." ECF 38-1 at 24, Niehaus Depo.

208:11. He explained that Grochowski "has definitely in the past displayed what you'd describe,

you know, a, on the side of the scale that is a consensus-builder. I have absolutely also

witnessed where she, when she entered or met conflict with those that did not see it the same

way and were just as confident in their position it was very challenging for Kathy to work

---

[23] It is unclear what position Parham held at SAIC. But, according to Grochowski's Declaration, when Parham was placed on the Performance Improvement Plan, he was working under her supervision . ECF 37-2 at 3, Grochowski Dec. ¶ 12.

through that to reach a consensus.  So – I think I've seen both sides." *Id.* at 15, Niehaus Depo. 146:11-20.

To illustrate, Niehaus recounted a "reoccurring issue" between Grochowski and a Marine Corps client, Lieutenant Commander Smith.  ECF 38-1 at 19, Niehaus Depo. 152:3; *see also id.* at 17-18.   Apparently, Smith "was not comfortable or was uncomfortable with Kathy's communication and her approach."  *Id.* at 17-18, Niehaus Depo. 150:20-151:1.  Without describing the particulars of the conflict between Smith and Grochowski, Niehaus testified that "it related to communication and style and personalities."  *Id.* at 21, Niehaus Depo. 158:2-3.  He also testified that he could not recall a similarly strained manager—customer relationship among his other employees.  *Id.* at 19, Niehaus Depo. 152:5-19.

In plaintiff's view, Niehaus's testimony reflects the double standard to which Grochowski was subjected.  Although Niehaus conceded that Grochowski was a "good project manager" (*id.* at 12, Niehaus Depo. 141:23), he criticized her purportedly confrontational management style.  As plaintiff sees it, Niehaus "reject[ed] characteristics of Ms. Grochowski's management style long acceptable in men," but deemed those same qualities unacceptable for women.  ECF 37 at 19, Opposition.

In this regard, Grochowski highlighted testimony from Niehaus, in which he did not recall that James Parham, an individual who created a problem for Ms. Grochowski, was placed on a Performance Improvement Plan ("PIP").  *See* ECF 37-2 at 3, Grochowski Dec. ¶ 12 (reflecting Parham's PIP placement).   Yet, Niehaus acknowledged that it is a "serious management action when a Performance Improvement Plan is issued[.]" ECF 38-1 at 38, Niehaus Depo. 264:17-265:6.  However, it is unclear from the record why Parham was placed on

a PIP, or whether it had anything to do with his management style.  Nor is it apparent from the record whether Parham was terminated as a result of the reduction in force.

Grochowski also complains that, at the relevant time, she suffered from disparate pay on the basis of her gender.  As noted, at the time of plaintiff's termination, her base salary was $113,300.  But, Dahart's base pay was $137,363.   ECF 26-10 at 1, EEOC Recommendation. Dahart also received a bonus for fiscal year 2010, yet Grochowski did not receive one, despite exceeding her annual revenue objectives.  ECF 37-2 at 1, Grochowski Dec. ¶ 4.

On September 20, 2010, Grochowski filed her Charge with the EEOC.  ECF 37-22, Charge.  She alleged, *id.*:

> I was hired by [SAIC] on June 25, 2006 as a Deputy Program Manager. On or about May 25, 2010,  I was told by Joe Niehaus (Operations Manager) and Sharon Storm (Human Resources Manager) that my position was being eliminated and my tasks were being moved to Stafford, Virginia. My tasks were given to Ron Dahart (mid 40's) although he fell short of his goals by twenty five percent and I exceeded my goals by six percent. Also, Mr. Dahart received an annual bonus and I did not. It has come to my attention, since my discharge, that Mr. Dahart is being paid about seventeen percent higher than I was.

Grochowski also asserted: "Mr. Niehaus stated I was selected to be laid off because of [the] reorganization of the company."  *Id.*  She insisted that she was "discriminated against because of [her] age (50) and sex (female)" and that her "tasks were given to a younger male who is being paid more, in violation of Title VII of the Civil Rights Act, as amended and the Equal Pay Act of 1963."[24]  *Id.*

On August 23, 2013, Grochowski received a "Dismissal and Notice of Rights" from the EEOC, providing "Notice of Suit Rights."  ECF 26-12.   The EEOC also determined: "Based

---

[24] Although the Charge references age discrimination, the Complaint does not include a claim for age discrimination.  ECF 2 at 1, Complaint.  Plaintiff also has not lodged a claim under the Equal Pay Act.

upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes . . . ." *Id.* This suit followed on November 25, 2013. *See* ECF 2, Complaint.

Additional facts are included in the Discussion.

## II.    Standard of Review

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id*. at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.; *see Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). The court should "view the evidence in the light most

favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Moreover, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black &. Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006). Indeed, in the face of conflicting evidence, summary judgment is generally not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Tolan v. Cotton*, ____ U.S. ____, 134 S. Ct. 1861, 1866-68 (2014) (per curiam).

However, to defeat summary judgment, conflicting evidence must give rise to a *genuine* dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id.* at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

### III.    Discussion

As noted, plaintiff lodges two counts.  Count I is titled "Discrimination under Title VII."  ECF 2 at 5, Complaint.  It includes two claims, both relating to purported discrimination by SAIC on the basis of sex. The first claim is for discriminatory termination, and the second claim is for disparate pay.  *Id.* ¶ 17-18.  Count II is titled "Stay of Threatened Arbitration."  Because defendant asserts that "is not seeking to bring this dispute to arbitration," ECF 26-1 at 1 n.1, SAIC Memo., I need only address plaintiff's Title VII claims in Count I.

#### A.  Title VII and Methods of Proof

Title VII prohibits a covered employer from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]"  42 U.S.C. § 2000e–2(a)(1); *see Young v. United Parcel Service, Inc.*, ____ U.S. ____, 135 S. Ct. 1338, 1344 (2015); *DeMasters v. Carilion Clinic, et al.*, ____ F.3d ____, 2015 WL 4717873, at *3 (4th Cir. Aug. 10, 2015); *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 420 (4th Cir. 2014).  "Liability in a disparate-treatment case 'depends on whether the protected trait . . . actually motivated the employer's decision.'"  *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) (citation omitted).

Discrimination on the basis of sex may be manifest in a variety of ways.  An employer discriminates on the basis of sex, for example, when it has different hiring criteria for men and women that are not related to a bona fide occupational qualification.  *See Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 544 (1971) (per curiam) ("The Court of Appeals therefore erred in reading [Title VII] as permitting one hiring policy for women and another for men—each having pre-school-age children.").  Moreover, Title VII expressly provides for "mixed-motive" liability,

stating: "Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."  42 U.S.C. § 2000e–2(m).

"Title VII does not remedy everything that makes an employee unhappy."  *Jeffers v. Thompson,* 264 F.Supp.2d 314, 329 (D. Md. 2003).   Thus, "the existence of some adverse employment action is required." *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004).   An "adverse employment action" is one that "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (2011) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

At trial, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *accord Price Waterhouse v. Hopkins*, 490 U.S. 228, 246 (1989).  With regard to proof of intentional discrimination, "[a]s in any lawsuit, the plaintiff may prove his [or her] case by direct or circumstantial evidence." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 n.3 (1983); *accord Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99 (2003).   "Direct evidence must be evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (internal quotation omitted); *see also Black's Law Dictionary*, "Direct Evidence" (9th ed.

2009) ("Evidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption.").

"Applying the usual Title VII analytical construct for sex discrimination claims," a court should "first consider whether [plaintiff] has shown any direct evidence of discrimination." *Young v. United Parcel Serv., Inc.*, 707 F.3d 437, 446 (4th Cir. 2013), *rev'd on other grounds*, _____ U.S. _____, 135 S. Ct 1338 (2015).  In the absence of "direct evidence that a workplace policy, practice, or decision relies expressly on a protected characteristic," a plaintiff in a disparate treatment case may use the burden shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny.  *Young*, 135 S. Ct. at 1345; *see Foster v. Univ. of Maryland-Eastern Shore*, 787 F.3d 243, 250 (4th Cir. 2015) (retaliation case).[25]

The *McDonnell Douglas* proof scheme applies at trial.  But, it has some utility at the summary judgment stage.  *See Pettis v. Nottoway Cnty. Sch. Bd.*, 592 F. App'x 158, 160 (4th Cir. 2014) ("Where, as here, a plaintiff does not allege direct evidence of discrimination, a plaintiff asserting racial discrimination may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas* . . . ."); *Stokes v. Va. Dep't of Corr.*, 512 F. App'x 281, 282 (4th Cir. 2013) ("Absent direct evidence of intentional discrimination, claims under Title VII are analyzed under the burden-shifting framework established in *McDonnell Douglas* . . . .").

In the absence of direct evidence, a plaintiff may create a rebuttable presumption of

---

[25] "It is left to the plaintiff's discretion whether to proceed by direct and indirect evidence or by mean[s] of the *McDonnell Douglas* burden-shifting framework." *Foster*, 787 F.3d at 249.

discrimination by establishing, by a preponderance of evidence, a "prima facie case" of discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *see also Diamond v. Colonial Life & Acc. Ins. Co.,* 416 F.3d 310, 318 (4th Cir. 2005) ("The Supreme Court constructed the elements of the prima facie case to give plaintiffs who lack direct evidence a method for raising an inference of discrimination."). In a termination case, the Fourth Circuit has said that, to establish a prima facie case of discrimination under Title VII, a plaintiff must show: "(1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." *Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2012) (internal quotations omitted).

Recognizing that it may be difficult to demonstrate the qualifications of the replacement in the context of a mass reduction in force ("RIF"), because the position may have been absorbed or combined with other positions, the Fourth Circuit has indicated that the elements of the prima facie case may be slightly modified in a RIF case. *See Corti v. Storage Tech. Corp.*, 304 F.3d 336, 340 n.6 (4th Cir. 2002). The Fourth Circuit has described the variation of the prima facie case in the context of a RIF as follows: "1) [plaintiff] was protected under Title VII, 2) she was selected from a larger group of candidates, 3) she was performing at a level substantially equivalent to the lowest level of that in the group retained, and 4) the process of selection produced a residual work force that contained some unprotected persons who were performing at a level lower than that at which the plaintiff was performing." *Corti*, 304 F.3d at 340 n.6; *cf. Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315 (4th Cir. 1993) (applying the RIF prima facie

standard in an Age Discrimination in Employment Act case).   The final element of the prima

facie case may also be satisfied by showing "some other evidence indicating that the employer

did not treat [the protected class] neutrally" when reducing the force.   *Herold v. Hajoca Corp.*,

864 F.2d 317, 319 (4th Cir.) (citing *E.E.O.C. v. W. Elec. Co.*, 713 F.2d 1011, 1014 (4th Cir.

1983)), *cert. denied*, 490 U.S. 1107 (1988).

As noted, if the plaintiff can establish a prima facie case, it creates a rebuttable

presumption of discrimination.   The burden then shifts to the defendant to "articulate some

legitimate, non-discriminatory reason for treating employees outside the protected class better

than employees within the protected class."   *Young*, 135 S. Ct. at 1345 (internal quotations

omitted). Once the defendant produces, "through the introduction of admissible evidence,"

legitimate, non-discriminatory reasons for its disputed employment action, "the presumption

raised by the prima facie case is rebutted," *Burdine*, *supra*, 450 U.S. at 255, and "drops from the

case . . . ." *Id.* at 255 n.10.   The plaintiff must then "'prove by a preponderance of the evidence

that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext

for discrimination.'"   *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000)

(quoting *Burdine*, 450 U.S. at 253).

"[T]he plaintiff cannot seek to expose that rationale as pretextual by focusing on minor

discrepancies that do not cast doubt on the explanation's validity, or by raising points that are

wholly irrelevant to it. The former would not create a genuine dispute, the latter would fail to be

material."   *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 216 (4th Cir. 2007) (internal

quotations omitted).   Rather, to show pretext, a plaintiff must proffer sufficient evidence such

that a reasonable trier of fact could conclude that the employer's explanation is false or

"'unworthy of credence,'" *Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir. 2004) (quoting *Burdine*, 450 U.S. at 256), and that discrimination was the true reason for the adverse employment action. *Hicks*, 509 U.S. at 515 (plaintiff must prove "*both* that the reason was false, *and* that discrimination was the real reason") (emphasis in *Hicks)*; *accord Adams v. Trustees of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011).

In assessing a defendant's proffered reasons, the Fourth Circuit has "repeatedly observed" that it is not a court's "'province to decide whether an employer's reason for terminating an employee was wise, fair, or even correct, ultimately, so long as it truly was the reason for the employee's termination.'" *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 211 (4th Cir. 2014) (brackets omitted) (quoting *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (citation and internal quotation marks omitted)). When the question at issue is whether the "'decision maker'" acted with discriminatory animus, only the "'perception of the decision maker'" is "'relevant'" to the question. *Hux v. City of Newport News, Va.*, 451 F.3d 311, 319 (4th Cir. 2006) (citation omitted).

Similarly, the beliefs of an employee who does not make the employment decision at issue, or intentionally and proximately cause it, will generally not be relevant to the pretext question. *See Staub v. Proctor Hosp.,* 562 U.S. 411, 419-22 (2011) (holding employer liable for act motivated by antimilitary bias where employee intentionally and proximately caused act, but was not de facto decision maker); *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 291 (4th Cir. 2004) (en banc) (holding employer responsible under Title VII and ADEA for actions of employee "principally responsible for the decision or the actual decisionmaker"); *see also Vicino v. Maryland*, 982 F.Supp.2d 601, 611 (D. Md. 2013) (synthesizing cases).

In seeking dismissal, SAIC characterizes plaintiff's allegations as "a tale that reads like an unsupported conspiracy theory tract."   ECF 50 at 1, Reply.   In particular, it argues that plaintiff has not established a prima facie case of discrimination.   In the alternative, defendant insists that, even if plaintiff has established a prima facie case, SAIC proffered a legitimate, non-discriminatory basis for its decision to lay off Grochowski, shifting the burden to plaintiff to establish that the reason offered was a pretext, and she has failed to do so.

I turn to analyze the parties' contentions.

**B.  Plaintiff's Case**

Plaintiff does not argue that her discrimination claim is based on direct evidence.   Nor does she point the Court to any direct evidence that SAIC fired Grochowski because of her sex. *Compare, e.g., Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 301 (4th Cir. 2010) ("A regional vice president remarked, for instance, that he 'didn't think a girl should have that [Pickup and Delivery] position.' . . . An operations' manager stated, '[t]his is not a woman's place.'") (alterations in *Merritt* ); *Baqir v. Principi*, 434 F.3d 733, 744 (4th Cir. 2006) ("Elliston told her 'that age [was] the major and only factor'" for Baqir's discharge . . . ").   As to direct evidence, plaintiff points to isolated comments of Niehaus that, in her view, suggest he held women and men to different standards.   She also relies on an organizational chart that she says shows her position was not abolished.

In the absence of direct evidence, Grochowski may rely on the *McDonnell Douglas* burden-shifting framework to create a presumption of discrimination.   This begins with establishing a prima facia case of discrimination.   *Stokes*, 512 F. App'x at 282.   As noted, to establish a prima facie case of discrimination under Title VII, a plaintiff must show: "(1) she is a

member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." *Bonds*, 629 F.3d at 386 (internal quotations omitted).

Grochowski contends that she has established a prima facie case of sex discrimination. ECF 37 at 21, Opposition. She asserts, ECF 37 at 11, Opposition: "Ms. Grochowski's position was never truly eliminated but also . . . termination was used to make work and functions available to favor two of her male counterparts, Mr. Dahart and Bristol Fontenot." Plaintiff highlights the following facts to establish that she was unlawfully terminated because of her sex, in violation of Title VII, *id.* at 3-4:

> [W]hat Defendant really did, under the cover of the reorganization, was terminate Ms. Grochowski, briefly park her position which was expressly left open, with Ronald Dahart, a comparator, who unlike Ms. Grochowski, was precariously short on billable hours during the reorganization, and, finally, five months later, after Mr. Dahart survived the reorganization, permanently refilled what was Ms. Grochowski's position with an individual who is also outside of her protected class, Mr. Bristol Fontenot. In filling Ms. Grochowski's position, moreover, Mr. Fontenot was promoted from his Project Manager position to Program Manager, the higher position that Ms. Grochowski held at the time of her termination, completing SAIC's discriminatory replacement of Ms. Grochowski and its favoring her male colleagues, Mr. Dahart and Mr. Fontenot.

In essence, plaintiff maintains that Niehaus orchestrated a scheme to replace Grochowski with Dahart as EOD Program Manager in the short-term, during the reorganization phase, and then in the long-term by Fontenot, once the reorganization was complete. The scheme of the employer involved "camouflaging of Defendant's discriminatory treatment" of plaintiff (ECF 37 at 3-4, Opposition), by briefly awarding plaintiff's position to Dahart so as to later award it to

Fontenot.  In plaintiff's view, this scheme reflected Niehaus's bias against women.  According to plaintiff, "Mr. Niehaus reject[ed] characteristics of Ms. Grochowski's management style long acceptable in men but, apparently to him, not in women."  *Id.* at 19.  She claims that "Mr. Niehaus[ ] simply favor[ed] Ms. Grochowski's male counterparts," Dahart and Fontenot.  *Id.*

Defendant maintains, *inter alia*, that the reorganization of SAIC was a business decision prompted by its client, the USMC.  It asserts that, in an effort to achieve certain efficiencies requested by the client, the management of the EOD program that plaintiff oversaw in Maryland was integrated with several other Marine Corps programs managed in Virginia.  SAIC also insists that plaintiff's theory as to the events is nothing more than "creative fictionalization," lacking any factual support.  ECF 50 at 15, Reply.  It posits:  "[Plaintiff] can present no evidence to support her theory that Major Dahart was a stalking horse for Bristol Fontenot so that after five months he could swoop in and become the beneficiary of gender discrimination."  *Id.*

It is undisputed that Grochowski was one of forty-eight employees terminated by SAIC in 2010, and the group included both men and women. Grochowski does not suggest that proportionally more women were terminated than men.

The parties initially failed to distinguish between the prima facie case in a traditional Title VII discrimination action and the prima facie case within the context of a reduction in force or RIF.   Instead, both parties discussed the traditional prima facie case.  ECF 37 at 20, Opposition (arguing that plaintiff has established a prima facie case under the traditional standard); ECF 26-1 at 22, SAIC Memo. (contending that plaintiff failed to show a prima facie case under the traditional discrimination standard).

In SAIC's Reply, however, it acknowledges an oversight in applying the elements of a

traditional discrimination claim.  ECF 50 at 14-15, Reply.  SAIC states: "[T]he correct standard

to use could be the standard applicable to a reduction in force . . . ." ECF 50 at 15, Reply.   But, it

explains that it addressed the traditional standard for the prima facie case because that is how

plaintiff framed her claim—as one of traditional discrimination.  *Id.* at 14-15. Despite the

oversight, defendant insists that, had the proper RIF prima facie standard been used, plaintiff's

claim would fail at this initial stage.  *Id.* at 15.[26]

> Defendant asserts, ECF 50 at 15, Reply:
>
> . . . Plaintiff has not even tried to show that she can meet [the RIF]
> standard . . . she has no evidence that the individual who absorbed her duties,
> Major Dahart, was "performing at a lower level than that at which the Plaintiff
> was performing." Major Dahart had significantly different duties from the
> Plaintiff, and, as is demonstrated by the record, he performed his more complex
> and broad duties very well.  Even if Plaintiff argues that both she and Major
> Dahart were satisfactory, this is not enough to make out her prima facie burden
> that Major Dahart was performing at a lower level than her [sic].

In my view, the proper standard is the RIF prima facie case.  Plaintiff's claims cannot be

examined in a vacuum, divorced of the critical fact that she was among nearly fifty employees

terminated by SAIC in 2010.

In the context of a RIF, the Fourth Circuit has described the variation of the prima facie

case as follows: "1) [plaintiff] was protected under Title VII, 2) she was selected from a larger

---

[26] Given that SAIC addressed the RIF prima facie case for the first time in its Reply,
plaintiff did not have an opportunity to respond.  "The ordinary rule in federal courts is that an
argument raised for the first time in a reply brief or memorandum will not be considered."
*Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006) (citing
*United States v. Williams*, 445 F.3d 724, 736 n.6 (4th Cir. 2006)).  Yet, plaintiff did not seek
leave to file a surreply to address the RIF standard.

The issue here is one of law.  Regardless of the parties' positions, I must apply the law
correctly.  I have, however, considered both the traditional standard and the RIF standard, for the
sake of completeness, and reach the same conclusion.

group of candidates, 3) she was performing at a level substantially equivalent to the lowest level of that in the group retained, and 4) the process of selection produced a residual work force that contained some unprotected persons who were performing at a level lower than that at which the plaintiff was performing." *Corti, supra*, 304 F.3d at 340 n.6.

In particular, the fourth element of a discrimination claim in the RIF context requires proof that "the process of selection produced a residual work force that contained some unprotected persons who were performing at a level lower than that at which the plaintiff was performing." *Corti*, 304 F.3d at 340 n.6.   Yet, plaintiff offers little evidence, other than a comparison of utilization rates, to establish that Major Dahart was performing at a lower level than Grochowski prior to her termination.

Plaintiff insists that, based on a review of the Dahart Timesheets, only 46% of Dahart's hours for the four-month period preceding Grochowski's termination constituted direct time billable to the client.  ECF 37 at 12, Opposition; *see* ECF 38-6, Dahart Timesheets; ECF 37-23 at 3, SAIC Responses (admitting Grochowski's direct time exceeded that of Dahart's for the four-month period prior to her termination).   In contrast, plaintiff maintains that 77% of her working hours constituted direct time.  ECF 37 at 12, Opposition; *see* ECF 38-7, Grochowski Timesheets. In its Reply, SAIC did not respond to plaintiff's suggestion that Dahart must have been performing at a lower level relative to Grochowski in view of their utilization rates. Nonetheless, Plaintiff's reliance on a utilization rate comparison is not persuasive.

The direct time ratio on which plaintiff relies says little about Dahart's responsibilities; notwithstanding the shared titles, the evidence demonstrates that the jobs of plaintiff and Dahart were quite different.  When Grochowski served as EOD Program Manager, she managed one

program, valued at $3 million, and supervised three employees. ECF 26-10 at 1, EEOC Recommendation.  Major Dahart, in contrast, managed six programs, with a total dollar value of $18 million, and he supervised over forty employees.  *Id.*  Greater management responsibilities are often associated with more administrative work or overhead.  In any event, direct billing is not the sole measure of performance or suitability.

Moreover, there is no question that the RFP sought to combine the program manager for the EOD program with the programs Dahart managed.  In view of the foregoing, plaintiff has failed to satisfy the fourth element of the RIF prima facie case, *i.e.*, that the residual work force contained unprotected persons performing at a lower level.

Assuming, *arguendo*, that the traditional prima facie case for discrimination applies, plaintiff still comes up short.  The first three elements of the traditional prima facie case are uncontested.  As a woman, plaintiff belongs to a protected class.  Grochowski lost her job with SAIC after the reorganization, which qualifies as an adverse employment action.  And, the parties agree that, as a general matter, prior to plaintiff's termination she was performing her job satisfactorily as a "good project manager."   ECF 38-1 at 12, Niehaus Depo. 141:23.  Only the fourth element of the prima facie case is in dispute.

The final element of the prima facie case requires plaintiff to demonstrate that, after leaving her position with SAIC, "the position remained open or was filled by similarly qualified applicants outside the protected class."  *Bonds*, 629 F.3d at 386 (internal quotations omitted).

Defendant argues that Grochowski cannot satisfy the final element of her prima facie case because the position was absorbed after the reorganization.   ECF 26-1 at 15, SAIC Memo.  It states: "SAIC made its decision based upon its belief that it would make business sense to

retain Major Dahart.  No evidence has been adduced to infer that this was a 'ruse' or a plan that was 'concocted' to intentionally harm the Plaintiff on account of her gender. . . ."  ECF 50 at 9, Reply.  *See Catalan v. House of Raeford*, 17 F. Supp. 3d 520, 527 (E.D.N.C. 2014) (granting summary judgment for employer on discriminatory demotion claim because, *inter alia*, employer presented uncontroverted evidence that plaintiff's position was eliminated "as part of an overall corporate restructuring process").

Conversely, plaintiff insists that her position was not eliminated.  She contends that "her position never disappeared from SAIC's organizational charts . . . ."  ECF 37 at 5, Opposition. Indeed, a "CBRNE EOD PM" position was listed in all organizational charts following Grochowski's departure.   Plaintiff observes that, following her departure, the SAIC organizational charts seemed to reflect that Dahart occupied plaintiff's position.  ECF 38-8 at 1, June 2010 Org. Chart.  And, in November 2010, the organizational charts listed Fontenot in plaintiff's former role as EOD PM.  *Id.* at 2, Nov. Org. 2010 Chart.  According to plaintiff, "the surfacing of Mr. Fontenot in [plaintiff's former] position within a few months after Ms. Grochowski's termination further belies SAIC's claims" that her job was eliminated as a result of the reorganization.  ECF 37 at 5, Opposition.  In plaintiff's view, she has produced evidence that the restructuring was a ruse and that Dahart held a functionally equivalent position.

In *Burgess v. Bowen*, 466 Fed. App'x. 272 (4th Cir. 2012), the Fourth Circuit recognized that evidence of a "functionally equivalent" position remaining after a reorganization could satisfy the fourth element of the prima facie case for discrimination if the new position "involved the same managerial and oversight responsibilities" as the original position.  *Id.* at 279.  But, the Court also accepted the "premise that there may be circumstances in which the differences

between two written job descriptions are so stark such that it cannot be said that 'the [first] position remained open to similarly qualified applicants'. . . ." *Id.* (alteration in *Burgess* and citation omitted).

The Fourth Circuit reversed the award of summary judgment to the employer, concluding that the district court erroneously determined, on facts quite different from those here, that the position in issue had been eliminated. *Id.* at 280. In its view, the trial court erred by failing to consider, in the light most favorable to plaintiff, the evidence challenging the employee's explanation for the elimination of the plaintiff's position. *Id.* The Fourth Circuit pointed to "significant inconsistencies as to whether other . . . positions were eliminated as part of a reorganization, whether budgetary pressures in fact necessitated the elimination of [plaintiff's] position," and other issues. *Id.; see also Murray v. Gilmore*, 406 F.3d 708, 714 (D.C. Cir. 2005) (recognizing that the fourth element of the prima face case for discrimination was satisfied when plaintiff offered "plentiful evidence from which a jury could conclude that rather than functionally eliminating the [plaintiff's] position . . . , [the defendant] simply gave the position a new title and tapped [someone else] to hold it"); *Garcia v. Pueblo Country Club*, 299 F.3d 1233, 1239-41 (10th Cir. 2002) (reversing summary judgment because a "key" factual dispute concerned issue of whether plaintiff's position was eliminated).

Notwithstanding this potential avenue to satisfy the fourth element of the prima facie case, plaintiff has not done so. Although the organizational chart continued to list EOD PM as a position at SAIC after Grochowski's termination, the record demonstrates that, after the

reorganization, the role of "EOD PM" changed.[27]   It was not the functional equivalent of Grochowski's former position.

 *Waldrop v. Sci. Applications Int'l Corp.*, No. AW-10-00328, 2011 WL 4025410 (D. Md. Sept. 9, 2011), *aff'd*, 473 F. App'x 220 (4th Cir. 2012) (per curiam), is instructive.  Waldrop, a woman of Iranian descent, worked at SAIC for nearly twenty-five years.  2011 WL 4025410 at *1.  In 2007, Waldrop joined a particular project at the National Institutes of Health as Deputy Director.  Soon after, the Project Director, Kathleen McCormick, began to make "numerous inappropriate remarks relating to Waldrop's national origin." *Id.*   When Waldrop initially complained about the remarks, McCormick was "reprimanded . . . ." *Id.*   Waldrop was subsequently promoted to "technical lead" on the project. *Id.*  McCormick "began retaliating against Waldrop for her complaint," and "refus[ed] to communicate with Waldrop in meetings." *Id.* at *2.  Eventually, Waldrop was "removed" from her role as Deputy Director of the project, and her work was "reassigned" to Russ Reiling, who "absorbed Waldrop's duties as 25-to-30 percent of his workload." *Id.*  Waldrop contended that she "lost income of $84,754.12 due to her removal, before she was able to find a new position at SAIC." *Id.*

 Waldrop filed suit under Title VII, alleging discrimination based on national origin and retaliation for protected activity.  SAIC moved for summary judgment, alleging, *inter alia*, that plaintiff failed to establish a prima facie case for discrimination. *Id.*  at *1.  In particular, defendant argued that Waldrop did not establish the fourth element, *i.e.*, that the position was awarded to a similarly situated person outside the protected class.

---

[27] There seems to be some dispute as to what "PM" stands for on the organizational chart. Defendant insists it means "Project Manager," not "Program Manager."  ECF 50 at 8 n.3, Reply. This discrepancy is not material.

The District Court determined that the position was "eliminated" because Rieling "absorbed" Waldrop's work as 20-to-30 percent of his workload. *Id.* at *4. Of particular relevance here, the District Court noted: "Where a plaintiff's duties are merely absorbed, this is insufficient to meet the fourth prong of the *McDonnell Douglas* test." *Id.* On appeal, the Fourth Circuit found "no reversible error" and affirmed the district court's decision, for the reasons stated by the district court. *Waldrop*, 473 F. App'x at 220.

Here, SAIC correctly asserts, ECF 26-1 at 23, SAIC Memo.:

> . . . Plaintiff's role came under Major Dahart, after the reorganization, as a small subset of the six other contracts he was managing. *See* Dep. of Niehaus 314:14-315:5. This is clearly shown in the June 2010 Preparedness and Response Division organization chart, which reflects the new organizational structure after Plaintiff was informed of her layoff in May, 2010—though she remained employed until July 2010. *Exhibit 18*. In this organizational chart, Major Dahart is shown as the Program Manager for all Marine Corps programs, while also having within his broader duties responsibility for the EOD program formerly associated with Plaintiff.

When Grochowski served as EOD Program Manager, she billed more to the client relative to her peers. But, as noted, when Dahart took over as Program Manager of EOD, he was already overseeing six other programs, with a total dollar value of $18 million, and supervised more employees than plaintiff had supervised. Managing the EOD, a $3 million program, was only one component of Dahart's overall responsibilities. Moreover, the integrated management and support staff across several Marine Corps programs (ECF 26-9 at 8, Niehaus Depo. 240:11-19) was undertaken in accordance with the client's request. ECF 29 at 7 (sealed), RFP 1.11.3. The employer was also entitled to determine that Virginia was a more suitable business location than Maryland.

Months later, in November 2010, when Fontenot took over the management of EOD, it

did not constitute all of his duties. ECF 38-1 at 45, Niehaus Depo. 316: 11-12.  Defendant admits

that "Fontenot's duties were of the type performed by Plaintiff prior to her layoff" (ECF 37-23 at

9, SAIC Responses), but asserts that the job was "less than full-time" for Fontenot as well.  ECF

38-1 at 45, Niehaus Depo. 316: 11.  In fact, when Fontenot took over as EOD PM, he served

concurrently as the deputy program lead for MAGTF.  *Id.,* Niehaus Depo. 316:3-5.

After the reorganization, neither Dahart nor Fontenot occupied a position "functionally

equivalent" to Grochowski's.  Therefore, Grochowski has failed to show that her position "was

filled by similarly qualified applicants outside of the protected class," as required for the final

element of the prima facie case.  *Harris v. Home Sales Co.*, 499 F. App'x 285, 291-92 (4th Cir.

2012).  Rather, her job was absorbed in part.  As such, Grochowski's prima facie case fails under

the traditional discrimination standard as well.

### C.  Pretext

Even if Grochowski could establish a prima facie case of gender discrimination, SAIC

has offered a legitimate, non-discriminatory reason for its termination of Grochowski—the

efficiencies gained by consolidation of EOD with the other Marine Corps programs, under one

Division Manager, as requested by its customer, the USMC.  SAIC has also proffered legitimate

reasons for choosing Dahart, rather than plaintiff, to oversee the consolidated operations.

The RFP (ECF 29) (sealed) unequivocally showed the client's preference for a

streamlined management structure as to multiple Marine Corps projects.  In particular, as noted,

section 1.11.3 of the RFP stated: "All attempts for the CM [*i.e.*, Contract Manager, per § 1.11.1

to be the same Program Manager for the MAGTF CBRN ACM program should be made."  ECF

29 at 7 (sealed), RFP 1.11.3.  In addition, the RFP requested that "all attempts [to

collaborate] . . . should be made," and expressly suggested that the requested "collaboration can be done" through using only one manager for both MAGTF and EOD. *Id.* at 2, RFP 1.4 (emphasis added). In view of the client's request, SAIC's decision to consolidate operations, and to do so in Virginia, appears quite sensible, if not necessary.

Moreover, SAIC cites a litany of reasons as to why Dahart was a better choice to oversee the consolidated operations. SAIC highlights, *inter alia*, that Dahart "was already located in Stafford, Virginia"; "he was managing more employees and contracts than Plaintiff with a greater dollar value"; "as a former Major in the U.S. Marine Corps Major Dahart had institutional knowledge of the client"; and Dahart "had greater familiarity with programs which were too complex for Plaintiff to handle and with which she had no experience." ECF 26-1 at 15, SAIC Memo. As explained by SAIC, "if one were to consider laying off Major Dahart and instead reassigning his six or seven contracts and forty-plus staff to Plaintiff, thus having the minnow swallow the whale, this would not have been feasible." *Id.* at 18.

As noted, the Marine Corps was the client, and Dahart is a former Marine. He was also familiar with the personnel in Stafford. In addition, he was adept at managing multiple, complicated programs at once. Grochowski offers scant evidence to refute that, from a business perspective, Dahart was a sensible choice. As observed by SAIC, plaintiff offers only "rampant speculation and unfounded hypothesizing." ECF 50 at 2, Reply.

Grochowski must demonstrate that the asserted reason or reasons are "actually a pretext for discrimination." *Hill*, 354 F.3d at 284–85. In this respect, Grochowski's claims can only survive a motion for summary judgment if she demonstrates a genuine dispute of material fact. In particular, the question is whether the evidence could persuade a reasonable juror that

defendant's proffered reasons are mere pretext, *and* that the real reason for the action was unlawful discrimination.  *See, e.g.*, *Adams*, *supra*, 640 F.3d at 560.

Notably, it is not the court's "province to decide whether [an employer's] reason [for terminating an employee] was wise, fair, or even correct, ultimately, so long as it truly was the reason for [the employee's] termination." *Walker*, *supra*, 775 F.3d at 211 (citations omitted) (alterations in *Walker*).  The Court does not "sit as a super-personnel department weighing the prudence of employment decisions made by the defendant[ ]."  *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 272 (4th Cir. 2005) (internal quotations omitted).

Grochowski insists that the proffered explanation for her termination—the alleged efficiencies that would result from consolidating several of the Marine Corps programs under unified management in Stafford, Virginia at the request of the client—was a pretext.  She posits that under the guise or "ruse" of a reorganization (ECF 37 at 16, Opposition), she was replaced by Dahart, and later by Fontenot, because of SAIC's preference for male employees.  But, at best, Grochowski has produced only de minimis evidence to support her contention that the employer's proffered reason for her termination, wise or unwise, was not the true reason.

To establish Niehaus's bias against women, plaintiff highlights his deposition testimony. Initially, Niehaus agreed that Grochowski was a good manager and that her performance was not the reason for her termination.  ECF 38-1 at 12, Niehaus Depo. 141.  Nevertheless, he later cited instances of her inability to build consensus, which negatively affected her performance.  ECF 38-1 at 24, Niehaus Depo. 208.  When discussing Grochowski's abilities as a manager, Niehaus also pointed to a "reoccurring" issue between Grochowski and Lieutenant Commander Smith, a Marine Corps customer who "was not comfortable" with Grochowski's "communication" and

"approach."  *Id.* at 17-18, Niehaus Depo. 150:20-21 to 151-1.  According to plaintiff, Niehaus's later deposition testimony contradicted his initial assertions that plaintiff's performance played *no part* in his decision to eliminate her position.

The statements are not necessarily in conflict.  Defendant agrees that plaintiff was a valued employee.  This does not foreclose issues with plaintiff's communication, however.  In any event, Niehaus's comments and reservations about plaintiff's management style do not create a *material* dispute of fact warranting trial.

Even if Niehaus took issue with Grochowski's approach with clients or colleagues, plaintiff has failed to adduce any evidence from which a reasonable juror could conclude that Niehaus's criticism of plaintiff's communication style was applied unequally across gender lines. In particular, there is no evidence that Niehaus overlooked similarly confrontational communication styles in men.  Nor are there any examples of male employees in comparable management positions who were permitted to retain their positions after the reorganization, despite having management styles akin to plaintiff's.  Grochowski only speculates that such traits were acceptable in men, but criticized in women.  "Unsupported speculation is not sufficient to defeat a summary judgment motion."  *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *see also Liberty Lobby*, *supra*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

In any event, Niehaus's comments are a thin reed in view of the overwhelming evidence, already recounted, explaining the reason for the consolidation and the choice of Dahart. Plaintiff's challenge to the veracity of the employer's proffered explanation does not

- 41 -

automatically allow the plaintiff to proceed to trial. Rather, "there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Reeves*, 530 U.S. at 148. Judgment as a matter of law remains appropriate if, for example, the plaintiff presents only a weak prima facie case, creates only a weak issue of fact as to whether the employer's explanation is untrue, and/or there is abundant evidence that no discrimination occurred. *Holland, supra,* 487 F.3d at 215 ("Thus, a key factor for courts to consider [on summary judgment] is 'the probative value of the proof that the employer's explanation is false.'") (citation omitted)); *Price v. Thompson*, 380 F.3d 209, 217 (4th Cir. 2004) ("[A]lthough *Reeves* will allow a plaintiff to survive summary judgment without presenting independent evidence of discrimination (or retaliation), it will permit this only where the other evidence of discrimination is sufficiently strong to ensure that the employer is held liable for unlawful discrimination and not merely for inconsistent statements that arise from reading applications hastily or from being nervous during depositions.").

Moreover, the fact that plaintiff's purported "replacements"[28] were men, outside of the protected class, is insufficient to create a genuine issue of material fact as to whether the proffered reason was pretextual. On this point, *Lawson v. Plantation Gen. Hosp., L.P.*, 704 F. Supp. 2d 1254, 1287 (S.D. Fla. 2010), is informative. There, when denying in part and granting in part defendant's motion for summary judgment, the court explained, *id.* at 1287:

---

[28] As discussed, *supra*, the role of "EOD PM" pre-reorganization and post-reorganization does not appear to be the same. After the reorganization, perhaps due to certain efficiency gains, the EOD PM role was narrower in scope. As noted, when Fontenot assumed the position, he concurrently served as deputy program lead for MAGTF.

Indeed, Plaintiff points only to the fact that [ ] a male, "replaced" Plaintiff as Executive Secretary. Plaintiff has not set forth any other evidence that suggests that her transfer was motivated by discriminatory animus because she is female.[ ] This raises no issue of fact with regard to pretext as it relates to Plaintiff's claim of discrimination based on her gender. In the absence of evidence favorable to Plaintiff on the issue of pretext, Plaintiff's claim for gender discrimination must fall.

Regardless of whether the purported replacements were men, the "ultimate question" in any discrimination case is the existence of "discrimination *vel non*." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 (1983). Grochowski has failed to establish a "genuine, triable issue," *Celotex Corp.*, *supra*, 477 U.S. at 327, as to whether SAIC discriminated against her.

At best, plaintiff has "created only a weak issue of fact as to whether the employer's reason was untrue . . . ." *Reeves*, 530 U.S. at 148. The RFP (ECF 29) (sealed) unequivocally revealed the client's preference for a streamlined management structure, in which the multiple Marine Corps projects would work together. ECF 29 at 2, 7 (sealed), 7, RFP 1.4, 1.11.3. Defendant's proffered explanation that Grochowski's termination was driven by the client's request for a more streamlined management structure is amply supported by the record, as are Dahart's credentials, such as his experience in overseeing multiple Marine Corps programs at once, and his experience as a former Marine in the very unit the SAIC contracts supported.

Here, both men and women were among those included in the RIF, and plaintiff does not suggest that proportionally more women were subject to termination. Plaintiff has provided only conclusory allegations that the adverse employment action occurred as a result of her sex. *See Causey v. Balog*, 162 F.3d 795, 802 (4th Cir. 1998) (affirming summary judgment where plaintiff "provided no evidence that the alleged acts of mistreatment were based on his race or

age"); *Hall v. Bausch & Lomb, Inc.,* No. DKC 10–0215, 2012 WL 3536755, at *11 (D. Md. Aug. 13, 2012) (granting summary judgment to defendant where plaintiff's "entire case for harassment is based on her own conclusory allegations" and explaining that "unsubstantiated allegations . . . are patently insufficient to prove 'a linkage between the hostile behavior and [her] membership in a protected class'") (quoting *Douglas-Slade v. LaHood*, 793 F.Supp.2d 82, 101 (D. D.C. 2011)).

To be sure, the RFP fell short of mandating a merger of EOD with MAGTF.  Also, as noted by plaintiff, the RFP "did not prescribe any particular organizational framework" for the consolidation.  ECF 37 at 18, Opposition.  Nonetheless, SAIC was entitled to determine how to effectuate the client's preferences and to do so within the context of a reduction in force.  With a reduction in force, "some workers must be let go, and difficult decisions have to be made." *Mereish*, *supra*, 359 F.3d at 338-39.  Plaintiff produced no evidence to refute defendant's argument that consolidating several of the Marine Corps programs, under the unified management of Dahart, was a reasonable business decision.

In sum, plaintiff has not presented sufficient evidence from which a factfinder could reasonably conclude that her termination was the result of sex discrimination, in violation of Title VII.  Accordingly, summary judgment will be granted as to SAIC as to the sex discrimination claim in Count I.[29]

---

[29] Defendant also argues that it is entitled to the same actor inference.  ECF 26-1 at 20-21, SAIC Memo.  Under this doctrine, if an employee is "hired and fired by the same person within a relatively short time span[,] . . . . [it] creates a strong inference that the employer's stated reason for acting against the employee is not pretextual." *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991); *see also Buchhagen v. ICF Int'l, Inc.*, 545 F. App'x 217, 220 (4th Cir. 2013) (describing the same actor inference as "a strong inference *against* discriminatory animus arises when the individual who hires an employee is the same person who discharges him only a few

### D.  Plaintiff's Disparate Pay Claim

As part of Count I, plaintiff alleges a claim for disparate pay under Title VII, on the basis of her gender. In particular, she contends:  "Defendant discriminated between employees on the basis of sex by paying wages to the Plaintiff at a rate less than the rate at which it pays wages to male employees in the same establishment for equal work . . . ."  ECF 2 ¶ 18, Complaint.

To establish a prima facie case of wage discrimination under Title VII, plaintiff must show that: "(1) she is a member of a protected class; (2) she was paid less than an employee outside the class; and (3) the higher paid employee was performing a substantially similar job." *Kess v. Mun. Employees Credit Union of Baltimore, Inc.*, 319 F. Supp. 2d 637, 644 (D. Md. 2004); *see also Siraj v. Hermitage in N. VA*, 51 Fed. App'x. 102, 112–13 (4th Cir. 2002); *Brinkley–Obu v. Hughes Training, Inc*., 36 F.3d 336, 343 (4th Cir. 1994).

"[T]wo parties are similarly situated if their job requirements are similar in the level of competency, education, and requirements." *Siraj*, 51 Fed. App'x. at 113 (citing *Lavin–McEleney v. Marist College*, 239 F.3d 476 (2d Cir. 2001)).  Similarity in titles, however, is not enough.  *See Gustin v. West Virginia Univ.*, 63 Fed. App'x 695, 698 (4th Cir. 2003).

There is no dispute that plaintiff is a member of a protected class. However, her allegations fail to support an inference that she received disparate pay because the alleged

---

months later") (emphasis in *Buchhagen*) (citing *Stone*, 945 F.2d at 797).  Niehaus recommended Grochowski for a promotion to Division Manager in 2008, and decided to terminate her in 2010.

Notably, the two employment actions must be taken "within a relatively short time span . . . ."  *Stone*, 945 F.2d at 798.  Generally, that is a matter of a "few months."  *Buchhagen*, 545 F. App'x at 220.  Here, several years passed between Niehaus's recommendation of a promotion for plaintiff in 2008 and his decision to terminate her in the summer of 2010. Nevertheless, I need not address this issue, in light of my disposition.

comparator she has identified, Dahart, was not performing a substantially similar job.  To be sure, Dahart and Grochowski shared the same title, *i.e.*, Division Manager.  ECF 25-3 at 3, Dahart Depo. 13:19.    But, they did not perform the same duties.    Dahart had more responsibilities than did Grochowski.  Dahart was overseeing several complex Marine Corps projects at once, while Grochowski managed only the EOD program.

To support that variances across division manager roles, and in particular the difference between the work performed by Dahart and Grochowski, SAIC relies on deposition testimony. At his deposition, Niehaus was asked:  "Are you saying that . . . there are differences among [division managers]?"  ECF 38-1 at 10, Niehaus Depo. 139:16-19.  He replied:  "Yes.  There was a wide, a wide variance in the Division Manager role not only within [EAI] but I believe it was noted across SAIC . . . ."  *Id.* at 10, Niehaus Depo. 139:19-21.

With respect to Grochowski's responsibilities, Niehaus described her focus as being on the "supply chain."  ECF 38-1, Niehaus Depo 132:16.  Grochowski managed programs worth $3 million and supervised only three subordinate employees.    *Id.*    In contrast, Dahart managed programs worth $18 million, and he supervised over forty subordinate employees.    ECF 26-10 at 1, EEOC Recommendation.

Niehaus also explained, ECF 26-9 at 6-7, Niehaus Depo. 136:8-137:3:

[M]anaging equipment [which is what Plaintiff was doing] is, there are less variables to manage. You have a lot of pieces of equipment but you're managing purchase orders, you're managing vendors and timelines whereas what, under [Major Dahart's] portfolio he was doing some of that, they had that feeding the MAGTAF and some of these other programs but on top, in addition to that you have people around the globe that are executing training courses to marines. They're developing technical data packages or technical documents for training or reference by the Marines. It's just a totally different complex. More people, more products being developed, products being a manual, a training manual, or some other training tool, actually delivering that tool and then all of the other

acceptance that goes with that. There's just a lot more moving pieces.

Similarly, Shoffner testified to differences existing between the roles of Grochowski and Dahart, and described Grochowski's projects as more equipment-focused. As to plaintiff, he explained, ECF 25-4 at 3, Shoffner Depo. 85:16-86:6:

> Typically [Grochowski's] programs were not people-focused programs or people-heavy programs. Typically she worked logistics, equipment procurement kind of stuff. And then you have got the sourcing procurement people who are working behind the scenes to get it all ordered. Then you have got a small handful of people who kit it and put it together for the customer, deploy it, field it, and service that to them . . . . And that doesn't take a lot of people."

In contrast, Shoffner agreed that the "typical" programs under Dahart's purview were "certainly" more "personnel rich or personnel heavy[.]" *Id.* at 86:11-16. These programs not only involved "equipment procurement piece[s]" but staffing needs as well. *Id.* at 86:16.

To illustrate the personnel needs of the programs to which Dahart was assigned, Shoffner drew on the Chemical Biological Incident Response Force, *i.e.* CBIRF, as an example. He described the program as follows, ECF 25-4 at 3, Shoffner Depo. at 86:11-87:15:

> Q. So is it -- so if I understand correctly – strike that. What about the programs to which Mr. Dahart was assigned, if you recall? Were they more personnel rich or personnel heavy?

> A. The typical Chemical Biological Incident Response Force, CBIRF, certainly was [personnel rich or personnel heavy] because it had not just the equipment procurement piece, but it had staff on site at the Marine Corps facility that were doing training, training development, exercises, day-to-day operations, and logistic support on site with the customer. So it wasn't just a here's a list of equipment, go procure it, package it up, and deliver it.

> Q. And what was Mr. Dahart's role in that program, if you recall?

> A. I believe we proposed Ron as the [program manager] on CBIRF because he was a retired Marine. He had been assigned at the CBIRF, so he had physically served in that unit. He knew their mission, their roles. He was also out of the Marine Corps Combat Developments Command. MCCDC is what they call

it. And in that assignment he had been responsible for helping prepare the doctor that that unit would use and the tactics and techniques of how they would deploy and employ their capabilities. And I believe he had also done a lot of the training development work . . .

Plaintiff disputes that her work was less complex than that of Dahart. To demonstrate that plaintiff's responsibilities were equally as complex, plaintiff refers to certain work breakdown structure ("WBS") charts. *See* ECF 37-7, "WBS Exhibit."[30] According to plaintiff, in a WBS chart, "tasks of a project are hierarchically and incrementally diagramed, usually in tree form, to depict their relationships to each other and to the project as a whole. It is consistent with the statement of work or requirements of a given project or contract. The WBS facilitates overall planning and control of a project. As a result, the WBS is a representation of the content and effort required to achieve the high level objective of a contract or project." ECF 37 at 7-8 n.2.

According to plaintiff, the WBS Exhibit demonstrates that plaintiff's responsibilities touched upon the following "matters," ECF 37 at 7, Opposition:

> Weapons of Mass Destruction (WMD) consequence management, Plans assessment, NET (New Equipment Training), Communications Training, CBRN (Chemical Biological Radiation Nuclear) Training, TTX (Tabletop Exercises), FE (Functional Exercises), FSE (Full Scale Exercises), CBRN Plans Updates, Equipment Procurement, Training Aids procurement, CONOPS (Concept of Operations) development and training, Kitting, Configuration Management, Contractor Logistics Support, Warranty Coordination, and Warehousing.

Plaintiff adds that the WBS also reflects, *id.*:

> Ms. Grochowski's programs were executed both in and beyond the continental

---

[30] SAIC objects to the Court's consideration of the WBS Exhibit. *See* ECF 50 at 10, Reply. In particular, it argues the document is "inadmissible, and therefore cannot be used to defeat summary judgment." *Id.* Given my disposition to grant SAIC's Motion and award summary judgment in favor of defendant, I will consider the exhibit, without resolving the merits of defendant's objection.

United States, including European and Asian sites. Up to 40 to 60 people supported programs that Ms. Grochowski managed at various points in time, and although these people did not all report directly to Ms. Grochowski, part of her job was to ensure they were all tasked and coordinated on an on-going basis.

The significance of the WBS Exhibit to this case is not immediately apparent from the documents themselves.[31] To illustrate, page eight shows an undated table, entitled "USMC EOD CBRNE Kits."   ECF 37-7 at 8.  The table lists various projects by project number and includes a "Description" of each one, as indicated, *id.*:

USMC EOD CBRNE Kits

| Project # | Description |
|---|---|
| 100400.225.301.001.01 | Program Spt PMIPCA Procure Spt |
| 100400.225.301.001.02 | Program Spt Travel |
| 100400.225.301.002.01 | Configuration Management |
| 100400.225.301.003.01 | Training Development |
| 100400.225.301.003.02 | Training Aids |
| 100400.225.301.004.01 | Kitting |
| 100400.225.301.005.01 | Training Camp Pendleton |
| 100400.225.301.005.02 | Training MCAS Yuma |
| 100400.225.301.005.03 | Training 29 Palms |
| 100400.225.301.005.04 | Training Camp Lejeune |
| 100400.225.301.005.05 | Training Beaufort |
| 100400.225.301.005.06 | Training Quantico |
| 100400.225.301.005.07 | Training MCBH Kaneohe Bay |
| 100400.225.301.005.08 | Training MCAS Iwakuni |
| 100400.225.301.005.09 | Training Okinawa |
| 100400.225.301.006.01 | Kit Equipment |
| 100400.225.303.007.01 | Out Bound Freight |

Generously construing the table, perhaps it suggests that some of the EOD projects that Grochowski oversaw involved trainings exercises. But, critically, the table is not dated, and it does not bear Grochowski's name.   Without some additional context, or at the very least a

---

[31] Unfortunately, in both the hard copy of the WBS exhibit submitted to the Court and the electronic version of the exhibit on CM/ECF, pages one through seven are not legible, although pages eight through ten are legible.

comparable table showing descriptions for Dahart's various projects, the table says little about how Grochowski's responsibilities compared to those of Dahart.

Pages nine through ten of the WBS Exhibit (ECF 37-7 at 9-10) comprise an undated list or outline of sorts, titled "Phase/Deliverable/Work Package Description" for the "EOD CBRNE Kit Equipment Procurement and Delivery Task Order." *Id.* at 9. The outline appears to include several nested lists of deliverables that SAIC was expected to provide to the Marine Corps for the EOD program. *Id.* Some of the "[d]eliverable[s]/[w]ork package[s]" listed are as follows: "Program Support;" "Program Management;" "Procurement Support;" "Client Meeting;" "Equipment Status Reports;" "Project Planning;" "Project Team Kickoff Meeting;" "Equipment Delivery Schedule;" "Project Execution, Monitoring and Control;" and "Equipment Shipment and Delivery." *Id.* Akin to the WBS table, it is difficult to discern from this list how the scope of Grochowski's work compared to Dahart's.

Plaintiff has failed to draw adequate parallels between her job responsibilities and those of her purported comparator, Dahart. In other words, plaintiff's evidence does not establish that Dahart and Grochowski are comparators. It is plain that the two employees had different responsibilities. Without similarly situated comparators, plaintiff cannot demonstrate that she received unequal pay despite working the same job as a male employee, so as to establish a prima facie case of pay discrimination. *See Floyd v. U.S. Dep't of Homeland Sec.,* No. RDB–09–0735, 2009 WL 3614830, at *8 (D. Md. Oct. 27, 2009) (finding that plaintiff did not make out a claim for disparate pay under Title VII because she did not establish that her purported comparator was "'similarly situated' or 'nearly identical in all respects'"); *cf. Alexander v. Marriott Int'l, Inc.*, No. RWT 09CV2402, 2011 WL 1231029, at *6 (D. Md. Mar. 29, 2011)

(dismissing plaintiff's Maryland Fair Employment Practices Act wage discrimination claim where she failed to identify a male employee with a similar job who was paid more than she was).  On this basis, the claim in Count I for disparate pay must fail.

### IV.    Conclusion

For the foregoing reasons, I will grant SAIC's Motion (ECF 26) as to Count I (Discrimination under Title VII) and Count II (Stay of Threatened Arbitration).  A separate Order follows, consistent with this Memorandum Opinion.


Date:   September 11, 2015                            _____/s/_____
                                                     Ellen Lipton Hollander
                                                     United States District Judge

**APPENDIX**
**GLOSSARY OF ACRONYMS AND ABBREVIATIONS**

| | |
|---|---|
| CBIRF | Chemical Biological Incident Response Force |
| CBRN | Chemical, Biological, Radioactive, and Nuclear program |
| CBRNE | Chemical, Biological, Radioactive, and Nuclear Explosive program |
| CLS | Contract Logistics Support or Contractor Logistic Support |
| DM | Division Manager |
| EAI | EAI Corporation, a subsidiary of SAIC |
| EOD | Explosive Ordinance Disposal program |
| IED | Improvised Explosive Device |
| IDD | IED Detection Dog program |
| IPP | Installation Protection Program |
| MAGTF | Marine Air Ground Task Force |
| MAGTF CBRN ACM | Marine Air Ground Task Force Chemical, Biological, Radiological, Nuclear Defense Assessment and Consequence Management |
| MCLEP | Marine Corps Law Enforcement Program |
| MWD | Military Working Dog program |
| PIP | Performance Improvement Plan |
| PMO | Program Management Office |
| PRD | Preparedness and Response Division |
| RFP | Request for Proposal |
| SAIC | Science Applications International Corporation |
| USMC | United States Marine Corps |
| WBS | Work Breakdown Structure |